**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Todd M. Horstkotte


   v.         Civil No. 08-cv-61-JL

William Wrenn, Commissioner,
New Hampshire Department of
Corrections, et al.


**REPORT AND RECOMMENDATION**


   Pro se plaintiff Todd Horstkotte, currently incarcerated at
the New Hampshire State Prison ("NHSP"), brought this 42 U.S.C. §
1983 action to complain about the inadequate medical care he has
received for his hepatitis C ("HCV") infection, asserting claims
based on constitutional, federal statutory, and state law.  In
the complaint, plaintiff requested a preliminary injunction to
release him from "unlawful incarceration."  Compl. (document no.
1) at 31.  That claim was dismissed following preliminary review
of the complaint, because claims of unlawful detention must be
brought under the habeas corpus statute, 28 U.S.C. § 2254, not
under § 1983.  The complaint was construed, however, to be
seeking injunctive relief to obtain urgently needed medical care.
See 28 U.S.C. § 1915A(a); United States District Court for the

District of New Hampshire Local Rule ("LR") 4.3(d)(2).

Defendants objected (document no. 13).  The matter was referred

to me for a recommendation of disposition, see 28 U.S.C. § 636

(b)(1)(b), and a hearing was held on May 22, 2008.

Since the hearing, plaintiff has filed two motions for a

preliminary injunction (document nos. 34 and 42).  Plaintiff

moved to dismiss the first motion (document no. 34), which

request was granted on July 29, 2008.  The second motion

(document no. 42) seeks an injunction to have the NHSP infirmary

inspected.  That motion, and defendants' objection thereto

(document no. 48), are currently before the court.  Pursuant to

this court's order of May 27, 2008, defendants filed a Notice of

Compliance to inform the court of plaintiff's classification

status (document no. 20).  Also pursuant to that same order,

defendants filed a report on the results of plaintiff's June 19,

2008, parole hearing (document no. 30).  These documents, along

with the several exhibits filed by both parties in support of

their respective positions on the preliminary injunction

requests, comprise the current record before the court.  After

carefully considering the facts and arguments presented in

support of the relief sought, I find that plaintiff has failed to

meet the substantial burden necessary to justify a preliminary injunction and recommend his requests for injunctive relief be denied.

<u>Background</u>

On June 27, 2007, plaintiff arrived at the NHSP to begin serving a 1–3 year sentence.  As part of the routine intake evaluation process, blood tests were performed, which revealed that plaintiff's liver enzyme levels ("ALT") were 171.  <u>See</u> Defs.' Obj. to Pl.'s Request for Inj. Relief (document no. 13) ("Defs.' Obj."), Ex. A., Aff. of Celia Englander, M.D., ¶¶ 4–5. That ALT level, combined with plaintiff's history of substance abuse, indicated that plaintiff may have HCV, so further testing was ordered in July 2007 which confirmed the presence of that virus.  <u>See</u> <u>id.</u> ¶¶ 6–7; <u>see</u> <u>also</u> Defs.' Exs. for the Prelim. Inj. Hrg. ("Defs.' Ex."), H & J.  Pursuant to standard procedure, plaintiff was also tested for hepatitis A and B and subsequently vaccinated against both diseases in the fall of 2007.  <u>See</u> Defs.' Obj. ¶ 9; Defs.' Ex. I.

Because plaintiff has HCV, NHSP medical director, defendant Dr. Celia Englander ("Dr. Englander"), evaluated his records to determine whether he was a candidate for treatment.  <u>See</u> Defs.'

Obj., Ex. A, ¶ 10.  Plaintiff's minimum parole date ("MPD") was
January 16, 2008, which automatically excluded him from treatment
under the prison's HCV treatment protocol.  NHSP policy provides
that an inmate must remain incarcerated for at least two and a
half years after the time of diagnosis to qualify for treatment.
See id.; see also Defs.' Obj., Ex. B, Aff. of Robert Macleod,
M.D., ¶ 9.  That policy factors in a period of time to evaluate
the progression of the disease and perform diagnostic testing,
then approximately 12 months to fully administer the drug
treatment program if it is warranted, followed by another six
months for the patient to be monitored post-treatment because of
the lingering toxicity of the drugs used.  See id., Ex. A, ¶ 11;
Ex. B, ¶ 9.  The MPD baseline enables the NHSP to ensure that the
patient receives the complete course of treatment while in
custody and avoids the potential health risks that interrupting
treatment can cause.  See id., Ex. A, ¶ 11; Ex. B., ¶¶ 11-12.
Because plaintiff's MPD was only six months away, and plaintiff's
sentence was only 1-3 years, he did not qualify for treatment,
eliminating the need for further diagnostic testing.  See id.,
Ex. A, ¶ 12.

    Dr. Englander knew plaintiff had been incarcerated at the

NHSP previously and released in June 2006.  Based on his records,
she also knew plaintiff had contracted the disease sometime
between November 2005, when plaintiff's ALT levels were normal,
and June 2007, when he was readmitted to the NHSP, and that it
was most likely he had contracted HCV after June 2006 when he was
last released from the NHSP.[1]  Given the onset time frame and
plaintiff's highly elevated ALT levels, Dr. Englander deduced
that plaintiff's illness was in its early stages, indicating that
drug therapy would be inadvisable.  See id., ¶¶ 10–11.

        In August 2007, plaintiff inadvertently discovered he had
HCV when he saw a medical record that reflected the diagnosis.
Plaintiff was upset and sought medical attention to determine the
extent of his liver damage.  To provide plaintiff with more
definitive information, in October 2007 Dr. Englander ordered
another blood test, the fibrosure test, which measures fibrosis
in the liver to help determine the disease's progression.  See
id., ¶ 12; see also Defs.' Ex. K.  Plaintiff's fibrosure test
results measured at .32, which indicated his HCV had progressed
to stage "F1–F2."  Id.  The range for stage F1–F2 is .31 to .48;

_____

        [1]During that previous incarceration, blood tests performed
on plaintiff in November 2005 showed no evidence of HCV, with an
ALT level at 10, which is considered normal for an uninfected
person.

results below .31 fall into stage F0–F1.  Because the fibrosure
test is highly sensitive and can "over read" fibrosis damage, and
because plaintiff had only recently contracted the disease, Dr.
Englander believed plaintiff's HCV was most likely no greater
than stage F1.  See Defs.' Obj., Ex. A, ¶¶ 13–15.

On December 10, 2007, Dr. Englander met with plaintiff to
explain his test results and treatment options.  See id., Ex. A,
¶ 16.  She advised plaintiff that drug therapy generally is not
recommended for patients at the early stages of the disease,
which plaintiff was at stage F1–F2.  That recommendation was
based both on the prison's HCV treatment protocol and National
Institute of Health studies that demonstrated the reduced
efficacy of treatment at the early stages of the disease.
See id.  She also explained to plaintiff that his MPD precluded
him from treatment because his drug therapy could be interrupted
if he were released, which could cause him to be resistant to any
subsequent drug treatment at a future time when it might be more
strongly medically indicated.  See id.  Finally, Dr. Englander
told plaintiff that HCV progresses very slowly, which meant it
could be several years before plaintiff might need treatment.

Plaintiff did not accept Dr. Englander's assessment of his

medical needs.  On January 4, 2008, plaintiff filed a complaint
with the New Hampshire Board of Medicine about the prison's
policy not to treat inmates with an MPD of less than two and one
half years.  See Defs.' Ex. O.  In that letter, plaintiff stated
he did not want to be released on parole and intended to serve
out his maximum sentence, which expires in January 2011.  As
plaintiff explained, "I am a ward of the State and in their
custody therefore the NHSP is completely responsible for every
aspect of my care."  Id.  Among other things in that complaint,
plaintiff argued he needed a liver biopsy to determine the
severity of his liver damage because the ALT levels could not
adequately assess that damage.  See id.  Plaintiff's complaint
was investigated by the Board, which concluded on April 2, 2008,
that "no further action [was] warranted."  Defs. Obj., Ex. A,
Attachment A–4 (document no. 13–5) (letter from N.H. Board of
Medicine to Dr. Englander).

On January 16, 2008, plaintiff's MPD, he was not granted
parole; in fact, he did not have a parole hearing until January
31, 2008, due to administrative errors at the prison.  He was
denied parole because he was classified at a security level of
"C4," and parole requires that an inmate be classified at no

greater than a "C3" security status.  See Defs.' Obj., Ex. C,
Aff. of John Eckert, ¶ 6.

        During the spring of 2008, plaintiff filed several inmate
request slips for documents regarding the NHSP's various medical
care policies and its HCV treatment protocol.  See e.g. Pl.'s
Suppl. Compl. (document no. 23) (attaching multiple inmate
request slips).  Plaintiff had additional blood tests to monitor
his HCV, which showed his ALT levels were falling, to 75 on April
10, 2008, and to 72 on May 22, 2008.  See Defs.' Obj., Ex. A., ¶
21; see also Defs.' Response to Court's May 27, 2008, Order
regarding Pl.'s Parole Hearing Results (document no. 30) ("Defs.'
Parole Hrg Response"), Ex. A, Aff. of Dr. Englander, ¶ 21 & Exs.
A-3 & F.  Despite those results, plaintiff has continued to
believe he needs immediate treatment for this "deadly disease."
Suppl. Compl., Ex. 7, Horstkotte Decl. (attaching 4/1/08 IRS as
ex. 26.1).  Plaintiff also has continued to request a liver
biopsy to better define the stage of his HCV, but that request
has been denied.

        In May 2008, the classification board recommended that
plaintiff be reclassified as C3, but plaintiff rejected that
recommendation and refused to sign the classification document.

See Defs.' Obj., Ex. C, ¶ 7.  A few weeks later, on May 29, 2008, plaintiff's classification was reconsidered again and he was reclassified as C3.  See Defs.' Notice of Compliance (document no. 20) ("Compliance Notice"), ¶ 2.  On June 19, 2008, plaintiff had a second parole hearing and again was denied parole.  At the hearing, plaintiff told the parole board that he did not know where he would be paroled to because his primary purpose was to get treatment for his HCV, and he was concerned about how the side effects of the treatment would impair his ability to work.  See Defs.' Parole Hrg Response, Ex. A (transcript of hearing).  Because he did not have a residence in place, plaintiff was denied parole.  See Defs.' Parole Hrg Response  ¶¶ 2, 5–7 & 18; see also id., Ex. A & I (results of parole hearing).

Plaintiff asserts that he needs a preliminary injunction to obtain necessary medical care.  He complains that he needs an antibiotic treatment plan and a liver biopsy, which the NHSP has refused to provide him because of his MPD.  He also argues the NHSP meal plan aggravates his medical condition by failing to provide him the balanced diet he needs.  He contends these decisions are based on monetary considerations rather than medical needs.  He claims defendants' failure to appropriately

treat his HCV violates the Eighth Amendment, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, et seq, and state tort law.

Discussion

**I.   Standard of Review**

As the moving party, plaintiff bears the burden of demonstrating that an injunction is needed to prevent irreparable harm and to preserve the status quo, to enable a meaningful disposition of his claims.  See CMM Cable Rep. v. Ocean Coast Props., 48 F.3d 618, 620-21 (1st Cir. 1995) (enjoining certain conduct permits the court "more effectively to remedy discerned wrongs").  Such a situation arises when some harm from the challenged conduct cannot be adequately redressed with traditional legal or equitable remedies following a trial.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18 (1st Cir. 1996) (finding irreparable harm where legal remedies are inadequate); Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (explaining irreparable harm).  To carry this burden, plaintiff must demonstrate:  "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of

relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) (internal quote omitted); see also Ross-Simons of Warwick, Inc., 102 F.3d at 18–19 (explaining the burden of proof for a preliminary injunction).

If plaintiff is not able to show a likelihood of success on the merits, the remaining factors "become matters of idle curiosity," id., insufficient to carry the weight of this extraordinary relief on their own. See Esso Standard Oil Co., 445 F.3d at 18 (the "sine qua non . . . is likelihood of success on the merits") (internal quotation omitted)). Although success on the merits is critical, a preliminary injunction will not issue unless plaintiff will be irreparably harmed without the requested relief. See Ross-Simons of Warwick, Inc., 102 F.3d at 19 ("the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem"). Because likelihood of success on the merits is the touchstone of the preliminary injunction inquiry, I begin by analyzing the merits of his claims.

**II.   Likelihood of Success**

A.   § 1983 Claims for Inadequate Medical Care

The Eighth Amendment guarantees that prisoners are not subject to cruel and unusual punishment. <u>See</u> U.S. Const. amend. VIII.  That protection has been construed to require that prison officials are not deliberately indifferent to an inmate's serious medical needs.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 831 (1994); <u>Estelle v. Gamble</u>, 429 U.S. 97, 103–04 (1976); <u>Surprenant v. Rivas</u>, 424 F.3d 5, 18–19 (1st Cir. 2005).  The medical need must be objectively serious, involving a substantial risk of serious harm if not properly treated.  <u>See</u> <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981); <u>Farmer</u>, 511 U.S. at 832; <u>Mahan v. Plymouth County House of Corr.</u>, 64 F.3d 14, 18 (1st Cir. 1995); <u>Barrett v. Coplan</u>, 292 F. Supp. 2d 281, 285 (D.N.H. 2003).  Deliberate indifference relates to the prison official's subjective awareness of the inmate's need and his intentional failure to ensure the needed treatment is provided.  <u>Farmer</u>, 511 U.S. at 837 (describing subjective intent requirement); <u>Estelle</u>, 429 U.S. at 105–06 (inflicting unnecessary and wanton pain violates the Eighth Amendment, not medical negligence); <u>Barrett</u>, 292 F. Supp. 2d at 285 (finding deliberate indifference "where the medical

12

care provided is so clearly inadequate as to amount to a refusal to provide essential care" (internal quotation omitted)).

### 1. Adequacy of Plaintiff's Medical Treatment

Plaintiff argues his treatment plan, specifically the decisions to deny him the drug treatment therapy and a liver biopsy based on his MPD, constitutes deliberate indifference to his serious medical needs. While it is undisputed that plaintiff suffers from HCV, which is an objectively serious infection that involves a substantial risk of significant harm if not properly treated[2], the evidence demonstrated that the NHSP's HCV treatment protocol is based on legitimate medical criteria that consider a host of factors, including health risks pertinent to the individual inmate's situation. Plaintiff's argument that the care he has received reflects an arbitrary, callous policy of deliberate indifference to his serious medical needs fails, for the following several reasons.

First, the evidence established that plaintiff's HCV is at a very early stage, when it would be medically inadvisable to

---

[2]Plaintiff produced multiple exhibits that documented the seriousness of the disease and that showed the complications, including cirrhosis, liver cancer and death, that can result if HCV is not adequately treated.

commence treatment.  Plaintiff's highly elevated initial ALT
levels, in July 2007, indicated the disease was at the acute
stage of infection, which presumption was validated by the
significant reduction in ALT levels in April and May 2008.
Plaintiff's fibrosure test results in October 2007 further
demonstrated that his infection was only in its incipiency,
approximating stage F1.[3]  Dr. Englander testified, both by
affidavit and at the hearing, that HCV is an extremely indolent
disease, typically taking decades to progress to the advanced
stages in which liver complications arise and when treatment
would be needed.  She explained that patients can live with HCV
at its early stages for years, and that approximately 15% of
patients are able to fight off the virus and become cured of the
disease without any treatment.  She also explained that at the
early stages of the disease, where plaintiff is now, the body's
immune system can impede the efficacy of the drug treatment
therapy.  Yet another factor against giving plaintiff the drug
therapy now is that it has many negative side-effects, which
present serious medical risks independent of the hepatitis C

---

[3]Though plaintiff argues he needs the liver biopsy to
determine what stage his HCV is at, the evidence showed that the
fibrosure test provides similarly accurate readings of liver
fibrosis to determine the disease's progression.

14

problems and render the treatment inadvisable unless absolutely necessary.  Based on these considerations, defendants concluded plaintiff's current condition did not justify treatment, regardless of his MPD.

Second, the NHSP policy not to consider treatment if an inmate's MPD is less than two and a half years away reflects careful decision-making based on both medical and institutional considerations.  The evidence showed that it takes several months to ascertain an inmate's need for drug treatment, then once the decision is made to begin the treatment program, it takes about 12 months to run its course, and then an additional six months for the patient to rid himself of the residual toxins.  The evidence also demonstrated that if the treatment is interrupted once it has begun, resuming treatment in the future can be ineffective and, as a result, potentially fatal for the patient. These are medically based parameters to the NHSP MPD policy, that were derived from multiple independent, credible medical sources. See Defs.' Obj., Ex. B, MacLeod Aff., ¶ 8 (listing references used to develop the prison's HCV protocol).  Dr. Englander testified that the treatment protocol is also very expensive, which factors against administering the drugs unless medically

necessary.  In plaintiff's case, where his disease is in its
early stages and he has no serious complications from the virus,
there was no compelling reason to depart from the NHSP protocol
that is based on plaintiff's MPD.

Third, nothing in the current record indicates plaintiff
needs a liver biopsy at this time, either to identify the stage
of his HCV or to make an informed decision about his treatment
plan.  Although the literature plaintiff proffered stated that a
liver biopsy "provides a unique source of information on fibrosis
and assessment of histology," Pl.'s Exs. for the Prelim. Inj. Hrg
("Pl.'s Ex."), Ex. 21 at 15, according to plaintiff's own
information, the biopsy is usually done only when necessary to
determine treatment options and is not always required to make
that decision.  See id.  The record here indicates the defendants
acted in a manner that was consistent with the conclusions of
that literature.  Dr. Englander testified that the NHSP algorithm
also requires a biopsy to determine treatment options, but only
when a patient's symptoms, such as persistently abnormal levels
of ALT and other physical impairments not exhibited by plaintiff,
indicate the disease has advanced beyond stage F2.  At that
point, to better determine the appropriate course of treatment,

16

either a liver biopsy or a fibrosure test is done, because both provide qualitatively similar information.  See Suppl. Compl., Ex. 8 (NHDOC HCV Treatment Algorithm).

Here, plaintiff was given a fibrosure test, even though it was not clinically indicated, and he knows definitively his HCV is at the very low range of stage F1-F2.  Dr. Englander opined she believes plaintiff is only at F0-F1, given his complete medical profile.  He currently has the information he claims only a liver biopsy can give him, to enable him to make an informed decision about his treatment.  He also knows the treatment recommendations for a patient with HCV at his stage of F1-F2.  As discussed above, at this early stage of the disease, it is medically inadvisable to begin drug therapy.  The record reflects that a liver biopsy would not provide any additional information to help plaintiff manage his disease at this time, to justify either its associated health risks or financial costs.

Fourth, the NHSP's HCV treatment protocol and the explanations Dr. Englander provided to justify the treatment decisions that have been made about plaintiff are consistent with medical standards, see Defs.' Obj., Ex. B, ¶ 8, as well as the medical literature that plaintiff himself adduced in support of

his request for injunctive relief.  See e.g. Pl.'s Exs. 2 at 8
(stating between 15-45% of people spontaneously clear Hepatitis
C), 14 (confirming blood test for HCV viral load positively
detects infection), 16 (ALT levels indicate the fact, but not the
extent, of liver cell damage), 17-18 (biopsy is the only test
that reveals the grade and stage of the disease, but is painful
and not always necessary), & 18-23 ("Balancing Pros & Cons of
treating HCV" because not everyone needs to be treated and the
side effects are "intense"); see also Pl.'s Ex. 21 at 21-22
(recommending HCV patients be vaccinated against hepatitis A and
B but advising the risks and benefits of antiviral therapy must
be assessed on an individual basis), 10-11 (explaining disease
progression is correlated to host-specific factors rather than
virologic factors); Pl.'s Ex. 4 (describing the slow advancement
of HCV).  This evidence supports a finding that the NHSP
treatment protocol is consistent with standard medical care for
the disease.

Finally, the evidence demonstrates that the medical care
plaintiff has received exceeds the NHSP treatment protocol.
Plaintiff received the standard blood work and recommended
immunizations after his elevated ALT levels were first detected.

18

Dr. Englander also orde red a fibrosure test to appease plaintiff, even though he was ineligible for treatment and neither a fibrosure test nor a liver biopsy were clinically indicated based on plaintiff's medical profile.  He was counseled about his disease and prognosis.  And he continues to be monitored, as evidenced by the April and May 2008 blood test results.

   This record shows that plaintiff is not likely to succeed on his claim for a denial of adequate medical care in violation of the Eighth Amendment.  Nothing in the record indicates he should, or would, be receiving the drug treatment therapy or a liver biopsy but for his MPD.  The evidence does not support plaintiff's claim that his treatment plan is arbitrarily and callously based on administrative and financial considerations. To the contrary, the evidence demonstrates that defendants have evaluated plaintiff's current health and have followed a treatment plan based on the risks HCV presents to plaintiff at this time.  While plaintiff may prefer more aggressive treatment or a more pro-active approach to assessing his HCV status, he certainly is receiving adequate medical care, which is all, as an incarcerated plaintiff, he has a right to receive.   See Torraco

v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (deliberate indifference found where "the attention received is so clearly inadequate as to amount to a refusal to provide essential care"); cf. Burke v. N.D. Dep't of Corr., 294 F.3d 1043, 1044 (8th Cir. 2002) (citing gross incompetence and intentional maltreatment as examples of deliberate indifference); see also Barrett, 292 F. Supp. 2d at 285.

### 2.  Adequacy of Plaintiff's Diet

Plaintiff also complains that the food served at the NHSP violates the Eighth Amendment by being so non-nutritious as to constitute deliberate indifference to his serious medical needs. He testified, both by affidavit and at the hearing, that the NHSP misrepresents the quantity of fresh foods and whole grains it serves.  Plaintiff contends that his diet is so lacking in essential ingredients that it is hindering his ability to combat his HCV.  This claim also is not supported by the record.

Plaintiff failed to proffer any evidence of any special dietary needs he now has because of his HCV status.  The pamphlets on which he relied discuss a balanced diet similar to that which any health-conscious adult would eat.  See Pl.'s Ex. 5, Ex. 7 at 11-12, & Ex. 8 (advising that the balanced diet "that

an average, healthy person gets will work just as well for people with hepatitis C"). Defendants proffered the menu for the week of May 18 to May 24, 2008, as an example of the meals served at the NHSP. See Defs.' Ex. S. The menu reflects a standard balanced diet, with fruit, juices, vegetables, breads and cereals, various forms of protein, including eggs, beans and meat, and dairy products. Defendants also proffered an invoice reflecting 1,770 pounds of frozen vegetables purchased for the prison on May 20, 2008. Both the sample menu and invoice reflect average weekly food consumption at the NHSP. See Defs.' Ex. T, Aff. of Jeff Perkins, ¶ 4. Plaintiff contends the sample menu and invoice do not reflect was is actually served. His purported concern about a healthy diet and his credibility were undermined by the canteen purchases he has made since being diagnosed with HCV, which include processed snacks and candy. See Defs.' Obj., Ex. 10. Without commenting on the quality of the food served or the individual choices plaintiff makes at the canteen, these exhibits demonstrate that an average, balanced diet is served. Although plaintiff claims he has lost weight since arriving at the NHSP, he did not appear at the hearing to be malnourished. While plaintiff may not like the food served, he has not

demonstrated how the NHSP diet is so inadequate that it reflects deliberate indifference to his serious medical needs, in violation of the Eighth Amendment's guarantee against cruel and unusual punishment.  Accordingly, I find that plaintiff has failed to demonstrate a likelihood of success on this claim.

While I recognize that plaintiff is genuinely concerned about his HCV status and justifiably wants to treat his disease aggressively, the preliminary record before me reflects that defendants are providing plaintiff with appropriate care given his current medical condition.  In order for a denial of medical care to rise to the level of an Eighth Amendment violation, the care must constitute "unnecessary and wanton infliction of pain" or "deliberate indifference to the serious medical needs" of plaintiff.  Estelle, 429 U.S. at 106.  Defendants here have not disregarded the "substantial risk of serious harm" HCV presents, by "failing to take reasonable measures to abate it."  Farmer, 511 U.S. at 847.  Defendants have developed and followed a protocol that reflects considered medical judgment, which factors in regular monitoring of plaintiff's HCV status and corresponding adjustments to his treatment plan.  They also serve plaintiff a regular diet.  Given the latitude afforded prison officials

regarding the administration of their prisons and the substantial medical evidence supporting the medical decisions made here, I find plaintiff is unlikely to succeed on his claims that the failure to give him the drug treatment therapy or the liver biopsy, or to change his diet violate the Eighth Amendment.

### 3.   **Quality of the Infirmary**

After the hearing, plaintiff filed a preliminary injunction motion seeking an order requiring the NHSP infirmary to comply with rules that mandate semi-annual inspections (document no. 42).  Plaintiff states that he received confirmation on July 16, 2008, that the N.H. Department of Health and Human Services does not inspect the infirmary, and he filed the motion two days later on July 18, 2008.  Whether or not this complaint could be subsumed by his inadequate medical care claims, plaintiff has not shown that the claim has been exhausted, as required by 42 U.S.C. § 1997e(a), and has not otherwise developed any evidence that suggests how the infirmary inspections are related to a violation of his Eighth Amendment rights.  Accordingly, I find plaintiff is unlikely to succeed on his Eighth Amendment claim based on a lack of infirmary inspections.

B.  The ADA Claim

Plaintiff contends that he has been denied the benefit of the NHSP's medical care because he has HCV, in violation of Title II of the ADA.  See 42 U.S.C. § 12132 (proscribing public entities from denying the benefits of services or programs to qualified individuals).  The ADA requires defendants, as public officials, to accommodate inmates with disabilities.  See Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 209-10 (1998); see also Jones v. Smith, 109 Fed. Appx. 304, 2004 WL 2053280, *3 (10th Cir. 2004).  Based on the facts here, to succeed on his ADA claim, plaintiff must show that (1) he is a "qualified individual with a disability," (2) that he was either excluded from or denied the benefits of NHSP medical services, and (3) that such exclusion, denial of benefits, or discrimination was because of his HCV status.  See Toledo v. Sanchez, 454 F.3d 24, 31 (1st Cir. 2006) (discussing claims under 42. U.S.C. § 12132).  For the following reasons, I find plaintiff is not likely to succeed on his ADA claim.

As a preliminary matter, an ADA claim, like all federal prison-conditions claims asserted by inmates, must be exhausted before it can be brought to federal court.  See 42 U.S.C. §

24

1997e(a); <u>see also Jones</u>, 2004 WL 2053280 at *2 (citing authority that applies § 1997e(a)'s exhaustion requirement to any prison condition claim alleged under federal law).  Nothing in the record suggests plaintiff first pursued his discrimination claim in the NHSP grievance process to satisfy this exhaustion requirement.

The current record also fails to satisfy any of the elements of an ADA claim.  First, plaintiff has not proffered any evidence that he has become disabled since contracting HCV.  The evidence shows that patients with HCV can live normal lives for many, many years while carrying the virus.  Plaintiff did not even know he had the disease when it was diagnosed, and did not produce any evidence that showed he has been inhibited in any of his major life activities, as is required to be a qualified individual with a disability.  <u>See Rolland v. Potter</u>, 492 F.3d 45, 47–48 (1st Cir. 2007) (citing <u>Toyota Motor Mfg., Ky., Inc. v. Williams</u>, 534 U.S. 184, 196–98 (2002) and defining disability as substantially impairing the ability to do activities that are of "central importance to most people's daily lives")[4].  Second, plaintiff

_____

[4]Plaintiff's reliance on <u>Sch. Bd. of Nassau County v. Arline</u>, 480 U.S. 273, 282–86 (1987) is misplaced, as that case involved a person with tuberculosis who readily satisfied the requirements for being disabled, because she had a physical

has not been denied medical care.  In fact, his HCV was
discovered because he was receiving medical care.  Third, despite
plaintiff's claim, as discussed at length above, plaintiff is
receiving medical care for his HCV.  The NHSP treatment protocol
is evenly administered to all inmates with HCV, and a significant
reason the MPD is used as a baseline for treatment decisions is
to ensure that treatment is fairly and consistently available to
the entire inmate population.  Simply because plaintiff's illness
has not progressed to the stage that requires treatment does not
mean plaintiff is being discriminated against because he has HCV.

Plaintiff is entitled to receive medical care like all other
inmates, but he is not entitled to demand his treatment of
choice.  Defendants' decisions with respect to the care plaintiff
has received reflect judgment calls, not discriminatory conduct.
Though plaintiff may believe he is being denied medical care
because he has HCV, that claim founders on the facts.  I find
plaintiff is unlikely to succeed on his ADA claim and recommend

---

impairment that substantially limited a major life activity.  <u>See</u>
<u>id.</u> at 281 (citing 45 C.F.R. § 84.3(j)(2)(i) and 29 U.S.C. § 706
(7)(B)(ii)).  The issue there was whether someone who was
handicapped and also contagious could be denied the protection of
the Rehabilitation Act requiring accommodation in employment.
<u>Arline</u> does not stand for the proposition that anyone with a
contagious disease has a disability.

that his request for an injunction to require defendants to provide the treatment options plaintiff wants be denied.

    C.  Remaining Claims

    In his complaint, plaintiff asserts a due process claim based on alleged parole procedure violations and a negligence claim based on the allegedly inadequate medical care.  Given the above analysis, it appears that plaintiff is unlikely to succeed on the merits of these claims.

    Although plaintiff contends his due process right to a parole hearing was violated, the current record is, at best, confusing about this claim.  The two week delay from plaintiff's January 16 MPD to his January 31, 2008, parole hearing is not a deprivation of due process.  Though plaintiff claims he wants to be released on parole to seek treatment for his HCV, the record contains at least two statements where plaintiff admits he has no intention of being paroled and wants to stay incarcerated so defendants can provide him with the care he needs.  Whether or not plaintiff can develop this claim later in the proceedings, after discovery perhaps better clarifies why he is not qualifying for parole, I find no basis in the current record to recommend that his request for injunctive relief on his due process claim

be granted.

Finally, plaintiff asserts that the NHSP's HCV treatment protocol constitutes medical malpractice. As a factual matter, plaintiff's January 4, 2008, complaint to the N.H. Board of Medicine was investigated and resolved with the Board determining that no further action was warranted. This resolution strongly suggests that plaintiff is unlikely to succeed in his medical negligence claim. As a jurisdictional matter, since plaintiff appears unlikely to succeed on the federal claims raised here, there would be no reason for the court to exercise its supplemental jurisdiction over his state law claims even if plaintiff were able to show some basis for the negligence claims asserted here. See 28 U.S.C. § 1367(a) (allowing a federal court to hear state law claims arising out of the same case or controversy as a federal claim over which it has jurisdiction). I, therefore, recommend that any request for injunctive relief based on negligent medical care be denied.

### Conclusion

For the reasons set forth above, I recommend that plaintiff's requests for a preliminary injunction set forth in the complaint (document nos. 1 and 23) and in the Motion for

28

Injunctive Relief (document no. 42) be denied.  I also recommend that defendants' Motion to Strike (document no. 48) be granted.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13–14 (1st Cir. 1992); United States v. Valencia–Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_____
James R. Muirhead
United States Magistrate Judge


Date:  August 18, 2008

cc:    Deborah B. Weissbard, Esq.
       Todd M. Horstkotte, pro se